UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80254-CIV-HURLEY

TIARA CONDOMINIUM ASSOCIATION, INC.,

    Plaintiff,

vs.

MARSH, USA, INC.,

    Defendant.
_____/

ORDER DENYING DEFENDANT'S
RENEWED MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the court upon Defendant Marsh, USA, Inc.'s renewed motion for summary judgment. The motion requires the court to address a novel question of Florida law: When an insurance broker shares a "special relationship" with its client, is the broker subject to an extra-contractual enhanced duty of care requiring the broker to advise the client about the amount of coverage prudently needed to meet its complete insurance needs. For the reasons stated hereafter, the court answers the question in the affirmative and, because there are genuine issues of material fact as to whether a "special relationship" existed between the parties, together with other disputed issues, the court will deny the defendant's renewed motion for summary judgment.

1

## I. PROCEDURAL HISTORY

Plaintiff, Tiara Condominium Association, Inc. ("Tiara"), manages the Tiara Condominium, an oceanfront 43-story tower located on Singer Island, Florida, which was devastated by two back-to-back hurricanes in September of 2004. Tiara filed this action against its insurance broker, Marsh, USA, Inc. ("Marsh"), asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, negligent misrepresentation, negligence and breach of fiduciary duty. Following briefing and oral argument, the court granted summary judgment in favor of Marsh on all claims.

The summary judgment ruling was affirmed by the United States Court of Appeals for the Eleventh Circuit on the two categories of contract claims, to wit: (1) the claim that Marsh breached its written contractual agreement by failing to procure per-occurrence insurance coverage, and (2) the claim that Marsh breached an oral agreement to take exclusive responsibility for ensuring the adequacy of Tiara's coverage, and specifically, by failing to advise Tiara that it was under-insured because of its reliance on an outdated, two-year-old property appraisal.[1] The Eleventh Circuit also affirmed the summary judgment ruling in favor of Marsh on the claims for negligent

---

[1] On the first category of claims, this court held, and the Eleventh Circuit affirmed, that the Citizens' policy in question in fact provided per-occurrence coverage, and that Tiara therefore stated no claim for breach of contract by reason of Marsh's alleged failure to procure per-occurrence coverage. On the second category of claims, this court held, and the Eleventh Circuit affirmed, that the oral contract between the parties did not require Marsh to ensure that Tiara was adequately insured, i.e. that the oral contract between the parties did not extend Marsh's responsibilities beyond that which was stated in Marsh's written letters of engagement [ECF No. 179, p. 8] [ *Tiara I*, 607 F.3d at 746-747], a list of proposed undertakings which did not specifically include a duty to advise on the optimal type or amounts of coverage needed to meet Tiara's complete insurance needs.

misrepresentation and breach of implied covenant of good faith and fair dealing. *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742 (11th Cir. 2010) (*Tiara I*).

On the negligence and breach of fiduciary duty claims, the Eleventh Circuit affirmed this court's summary judgment ruling to the extent that Tiara's claims rested on Marsh's alleged failure to procure per-occurrence as opposed to aggregate limits of liability. However, to the extent these claims were based on Marsh's alleged failure to advise Tiara that it was under-insured and to properly advise Tiara on the adequacy of its coverage, the Eleventh Circuit concluded that this court's reliance on Florida's economic loss rule, which if applicable would have barred both tort claims, raised an unsettled question of Florida law. Therefore, the Eleventh Circuit certified a question to the Florida Supreme Court, requesting it to determine whether the economic loss rule applied to insurance brokers.

The Florida Supreme Court restated the question, querying instead whether the economic loss rule applies at all to an insured's suit against an insurance broker for purely economic losses where the parties are in contractual privity. On this question, it held, receding from established precedent, that "the application of the economic loss rule is limited to products liability cases."[2]

---

[2] In *Tiara II*, the Florida Supreme Court concluded:

> Having reviewed the origin and original purpose of the economic loss rule, and what has been described as the unprincipled extension of the rule, we now take this final step and hold that the economic loss rule applies only in the products liability context. We thus recede from our prior rulings to the extent that they have applied the economic loss rule to cases other than products liability.

*Tiara II* at 407.

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.,* 110 So.3d 399, 407 (Fla. 2013) (*Tiara II*). Relying on the Florida Supreme Court's restatement of Florida law, the Eleventh Circuit ruled that Florida's economic loss doctrine did not preclude Tiara's tort claims against Marsh for breach of fiduciary duty and negligence, and remanded these claims to this court for reconsideration. *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.,* 714 F.3d 1253 (11th Cir. 2013) (*Tiara III*).

## II. ISSUES ON RENEWED SUMMARY JUDGMENT

In its renewed motion for summary judgment, Marsh contends that it had no extra-contractual duty to advise Tiara on its full coverage needs, and specifically, had no duty to recommend Tiara's procurement of an updated appraisal on which to gauge optimal insurable value.[3] It further contends that it had no duty to warn of the danger of under-insurance and no duty to provide recommendations on reasonable, prudent policy limits of loss in light of Tiara's complete insurance needs. Based on the contractual relationship of the parties, Marsh asserts that Florida's "independent tort rule" precludes assertion of these claims which it contends are simply "duplicative" of the contract claims,

---

[3] As a threshold matter, Marsh advances the view that no further examination of these claims is necessary because the court's original summary judgment ruling included an alternative ruling on the merits of these claims, which was not reviewed or disturbed on appeal, and which independently sustains the ruling. However, this is not an accurate characterization of the original summary ruling. The court's prior ruling did contain an alternative determination that there were no genuine issues of material fact on the merits of Tiara's common law negligence or breach of fiduciary duty claims, but only insofar as these claims were based on Marsh's alleged failure to procure a per-occurrence policy which reset with each occurrence [ECF No. 179, pp. 12-15], and that aspect of the ruling was sustained on appeal. The order did not address the sufficiency of evidence or merits on the second aspect of these claims, i.e. the claim that Marsh breached extra-contractual duties of care by failing to properly advise Tiara on the amount of insurance needed to reasonably and prudently protect its complete insurance needs. This issue is here addressed, for the first time, in the renewed summary judgment proceedings currently pending before the court.

*i.e.* the claims do not depend on a breach of any extra-contractual duties. Alternatively, Marsh contends that even if its alleged lapses in this regard are viewed as a breach of some extra-contractual duties of care, it cannot be liable for the claimed breaches because Tiara cannot demonstrate a causal connection between the alleged breaches and the damages claimed by Tiara.

On the causation issue, Marsh argues, first, that Tiara's negotiation of an $89 million settlement with Citizens Property Insurance Corporation ("Citizens") – $11 million short of the $100 million in total windstorm coverage procured by Marsh – defeats any claim of alleged "under-insurance" attributable to Marsh. Second, to the extent Tiara seeks to hold Marsh liable for the difference between the $100 million loss limit of the policies and the $130 million which Tiara purportedly spent restoring the condominium property, Marsh contends Tiara is unable to demonstrate a causal connection between Marsh's alleged lapses and the coverage gap because a large proportion of the Tiara restoration costs were the product of waste and fraud – *e.g.* $36 million incurred for a fruitless drying-out procedure mandated by Citizens, and $37 million consumed by fraudulent billings submitted by various reconstruction vendors.

### III. FACTUAL RECORD AT SUMMARY JUDGMENT[4]

Tiara is managed by an elected board of governors which relies on the advice of retained professionals in making business decisions and in administering the common elements of the condominium property. Tiara's insurance program is overseen by an insurance committee, a sub-

---

[4] The recited facts, drawn from the parties' submissions in the renewed summary judgment proceedings and the allegations of the plaintiff's operative third amended complaint, are either undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.

committee of the board of governors, which makes recommendations to the board.  In 2002, the insurance committee  interviewed several insurance brokers and, relying on Marsh's claims of exceptional size, experience, resources and commitment to excellent service, recommended that Marsh be retained to handle Tiara's insurance needs.   The board accepted the committee's recommendation and orally advised Marsh of its decision.  Marsh in turn confirmed the arrangement in an  "engagement of services" letter dated November 26, 2002, there describing itself as Tiara's "exclusive insurance,  risk management and  risk  financing advisor and insurance  broker," and itemizing a number of specific services  which it  committed to perform for Tiara within this role [ECF No. 303-4].   Neil Hewitt, the Marsh executive designated to serve  the Tiara account, regularly attended and  participated  in all Tiara insurance committee meetings.

Marsh's contract with Tiara was twice renewed, as memorialized  in a subsequent "engagement of services" letter dated  August 1, 2003, covering the period of June 1, 2003 - June 1, 2004, in effect when Marsh brokered the subject June 2004 windstorm policy issued by Citizens Property Insurance Corporation [ECF No.  303, Ex.5] , and again in an engagement of services letter dated June 24, 2004, in effect during the period the claims for Hurricanes Frances and Jeanne were made.  [ECF No. 303, Ex. 6].

Prior to retaining Marsh, Tiara engaged the services of Allied Appraisal Services, Inc. ("Allied") to appraise the condominium building  in calendar years 1988 through 1991 and 1998. On March 8, 2002, Tiara received an updated appraisal from Allied, based on an inspection that had occurred in 1998, which calculated the  replacement  value  of the condominium  building  at $57,553.198.00.  Allied  also calculated the value of certain optional exclusions relating to interior

unit structures (*e.g.* cabinets, appliances, air conditioning units, etc.) to be $5,519.040.00.

In 2004, Jack Quinlan, the chairman of Tiara's insurance committee, spoke to a representative from Allied about obtaining an updated apprisal. Allied responded that while an updated appraisal was required only once every six years, a new appraisal was advisable and would likely raise the value of the building by a margin of seven to nine percent. When it was time to renew the Citizens' policy for the 2004-2005 term, Tiara turned to Marsh with this information and asked whether the 2002 Allied appraisal was an adequate starting point for determining the insurable value of the Tiara building. Hewitt responded, in writing, "I am not familiar with any carrier requirement that you must get an updated apprisal this year. In fact, I dispute that a full appraisal is required every six years. If there is any obligation, it falls within an Association mandate rather than an insurance requirement." [ECF No. 303, Ex. 10, p. 3]. Tiara claims to have interpreted this to mean that the 2002 Allied appraisal was adequate for its needs, and relied upon Hewitt's endorsement of this approach in deciding not to seek a new appraisal of the property at the time of the 2004-2005 policy renewal.

Quinlan also asked Hewitt whether Tiara was allowed to make a manual adjustment to the appraisal by backing out the value of certain built-in fixtures within each unit, estimated by Allied to be worth roughly $5.5 million, and Hewitt advised, in writing, "There is no problem with backing the 5.5 million out of the current appraisal." [ECF No. 303, Ex. 10, p. 3]. Mr. Hewitt has since stated, in deposition testimony, that he recognized Marsh had a general obligation to notify its insureds, including Tiara, of any under-insurance issues. He also testified that as a general rule Marsh did advise its clients to obtain new property appraisals on an annual basis. He went on to say

that he believed Tiara was under-insured at the time of its 2004-2005 policy renewal because it had reduced the true insurable value of the building on the basis of an outdated, two-year old appraisal and on the basis of additional optional exclusions (interior value exclusions). Finally, Hewitt testified that he did, in fact, discuss the under-insurance issue with Tiara and said that he specifically recommended that the insurance committee order an updated property appraisal in 2004. He acknowledged, however, that he did not recall whether he put this advice into writing.

Rosalia Croes, the Marsh client representative assigned to the Tiara account, stated at her deposition that it is the obligation of both the assigned client representative (Croes) and the client executive (Hewitt) to review coverages offered to all clients on an annual basis to ensure that they are sufficient for the client's needs [ECF No. 303, Ex.8, p. 6], and that as part of this review, Marsh's general practice is to ask its condominium clients to provide a new appraisal every year. Croes was unaware, however, as to whether Marsh in fact made such a request to Tiara in either 2003 or 2004. [ECF No. 303, Ex. 8, p. 9].

For its part, Tiara contends that neither Hewitt, nor anyone else from Marsh, ever recommended or advised that it obtain a new appraisal at the time of the 2004-2005 policy renewal, and that Marsh never warned Tiara that a calculation of insurable value predicated on a two-year-old appraisal, while legally permissible, might lead to far less coverage than that reasonably and prudently needed to meet its complete insurance needs.

In April 2004, Marsh presented an insurance proposal to Tiara for renewal of its 2004-05 windstorm policy containing a policy loss limit of $49,970,350.00. Tiara accepted the coverage proposed by Marsh, allegedly relying on Marsh's exercise of professional independent judgment in

8

assessing and endorsing the sufficiency of that coverage.  In June 2004, Citizens issued a windstorm policy to Tiara incorporating this loss limit.  The premium was $253,362.00, a reduction of $40,000.00 from the prior year. While the policy provided coverage for debris removal, it did not include "law and ordinance" coverage, *i.e.* coverage for expenses associated with rebuilding the structure in compliance with current local building code laws and ordinances (as opposed to those in effect at time of original construction) - a coverage which was not offered by Citizens.

In defending its handling of the Citizens' 2004-05 policy renewal, Marsh contends that Neil Hewitt, its client executive, simply acted on orders from Tiara when he submitted an insurance proposal to Citizens incorporating the $49,970,530.00 valuation supplied by Quinlan, and that Tiara either did or should have understood that Marsh was not providing appraisal services or purporting to "sign off" on the accuracy of the appraisal values used to set the loss limit. On the latter point, Marsh cites to cautionary language contained in its August 2003 engagement of services letter stating that "Marsh will not independently verify or authenticate information provided by you necessary to prepare underwriting submissions and other documents relied upon by insurers, and you will be solely responsible for the accuracy and completeness of such information and other documents furnished to Marsh and/or insurers and will sign any application for insurance." [ECF No. 301, Ex. 23, p. 2].

Marsh also argues that Tiara's insurance committee was comprised of sophisticated businessmen (including a former life insurance executive, an attorney and an accountant), all of whom were directly privy to information, supplied by Allied, showing that the valuation fixed in 2002 was outdated, and that by 2004 it underestimated the building's value by roughly 7 to 9

percent. Marsh asserts  that the insurance committee made an informed choice, relying on information it knew to be outdated, to take the risk of proceeding with less than full insurable value and replacement coverage for the building in order to achieve a cost-savings on premiums – a goal which it actually achieved in the form of a $40,000.00 reduction in policy premium for the 2004-05 policy year. On this predicate, Marsh contends that Hewitt acted reasonably when he took Quinlan's notes on the property valuation and simply relayed them to Citizens with a corresponding request for coverage.

Tiara disputes this characterization of the exchange between Quinlan and Hewitt, contending that  Quinlan made his calculations for simple cost comparison discussion  purposes, and then passed along his notes  to Hewitt in order to receive the benefit of Hewitt's  independent judgment and advice as to the  wisdom of  using those calculations as the starting point for calculating insurable value. Tiara contends  that Marsh acted unreasonably, in breach of its common law fiduciary duties and duty of reasonable care, when it did not provide Tiara with the benefit of its independent judgment and advice, but instead  simply conveyed  Quinlan's figure to Citizens, without cautioning Quinlan or  the insurance committee on  the risks of under-insurance attendant to such a posture, particularly in light of the sizable co-insurance requirement imposed by Citizens (requiring the policyholder to maintain coverage in an  amount equal to 100% of the building replacement cost).

Hurricanes Frances and Jeanne made a direct  hit on  South Florida on September 4, 2004 and  September 25, 2005, respectively, causing over $100 million in damage to the Tiara condominium building.  Tiara promptly submitted a claim to Citizens for these losses. Shortly after, in January 2005, while Tiara was engaged in an expensive dry-out procedure called for under a

building remediation program mandated by Citizens, Citizens asked Marsh for a copy of Tiara's last property appraisal, indicating that it needed this information to assess whether Tiara had met its co-insurance obligation of insuring 100% of the replacement cost of the building. Marsh informed Tiara that Citizens had requested the appraisal, but did not mention the stated reason for its request.

In July 2005, Citizens notified Tiara of its position that the policy did not "reset," *i.e.*, that the policy covered only one occurrence, providing a maximum of $50,000,000. Tiara took the position that the policy automatically reset and therefore provided a maximum of $100,000,000. Therefore, Tiara sued Citizens to resolve the dispute and in March, 2006, agreed to settle its claim against Citizens for $ 89 million, roughly $10 million less than the total available for two separate occurrences under the policy, and roughly $30 million less than its then anticipated restoration costs (exceeding $120 million). According to Tiara, its decision to accept less than full policy value from Citizens, notwithstanding the known magnitude of its loss, was largely motivated by Citizens' assertion of the "under-insurance" issue as an affirmative defense in the coverage litigation.

In early 2005, in the process of renewing Tiara's windstorm policy, Marsh obtained an updated property appraisal of the Tiara condominium building, and in reliance on the new report recommended an increase in Tiara's insurable value to $68,345,800 - a nearly 40% increase from that recommended in the preceding policy year.

## IV. DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is appropriate if the pleadings, depositions and affidavits, viewed in the light most favorable to the non-moving party, demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Swain v. Hillsborough*

11

*Cnty. Sch. Bd.,* 146 F.3d 855 (11th Cir. 1998).  To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations,' but must raise 'significant probative evidence' that would be sufficient for a jury to find for that party. *LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir. 1998).  Summary judgment is appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Williams  v.  Vitro Servs. Corp,* 144 F.3d 1438, 1441 (11th Cir. 1998).

### B.  Florida's Independent Tort Rule

In this case, Marsh argues that Tiara's claims for breach of fiduciary duty and negligence are barred by Florida's independent tort rule, which posits that a party to a contract can recover economic loss in tort against the other contracting party only when there is additional, wrongful conduct chargeable to that party which amounts to a tort independent and separate from the claimed contract breach.  *See e.g Southern Bell Tel. & Tel. Co. v Hanft,* 436 So.2d 40 (Fla. 1983); *Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So.2d 530 (Fla. 2d DCA 1999) (existence of contract  bars a tort claim relating to economic risks that were subject of contract absent a separate independent tort, because any other rule would unfairly shift economic risk parties could have shifted through bargaining).

Arguably, Florida's "independent tort rule" is but a preliminary version, or simple predecessor, of what later became known as the "contractual privity economic loss rule " – a rule which similarly posits, "[A] tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract." *Tiara II,* at 402, citing *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.,* 891 So.2d 532, 536-37 (Fla. 2004) and *Weimar v. Yacht Club Point Estates, Inc.,* 223 So.2d 100, 103 (Fla. 4th DCA 1969) ("[N]o cause of action in tort can arise from a breach of a

duty existing by virtue of contract."). Under this view, the Florida Supreme Court's restriction of the contractual privity economic loss rule, announced in *Tiara II,* necessarily swept with it the corollary concept of the "independent tort rule." While this may be a logical and necessary implication of *Tiara II* -- and one which would require summary rejection of Marsh's "independent tort rule" challenge to Tiara's remaining tort claims – the court finds it unnecessary to reach this issue because it concludes that Tiara's remaining common law tort claims are necessarily based on extra-contractual duties of care. Thus, even assuming that Florida law still holds, as between parties in contractual privity, that no tort action will lie unless a breach of the contract is attended by some additional conduct which amounts to an independent tort, in this case the tort claims of Tiara are based on the breach of duties which are not contractually grounded, and therefore, inevitably fall outside the reach of the "independent tort rule" in any event. *See generally In re Estate of Gattis,* No. 12CA1269, 2013 WL 5947134 (Colo.App. Nov. 7, 2013).

## C.  Common Law Tort Duties of Insurance Brokers

Florida law has long recognized that an insurance broker owes a fiduciary duty of care to the insured. *See Wachovia Ins. Serv., Inc. v. Toomey,* 994 So.2d 980, 987 (Fla. 2008). This duty imposes an obligation on the broker to inform and explain the coverage it has secured at the client's direction and, in the event the broker makes unilateral changes in the coverage, the broker is obligated to advise the insured of those changes. *Id.* at 987. In addition to the obligations imposed by virtue of the broker's fiduciary status, Florida law imposes a separate duty of care upon a broker, requiring it to use reasonable care in the procurement of requested insurance coverage. *Toomey* at 990 n. 4, citing *Romo v Amedex Ins. Co.*, 930 So.2d 643, 654 (Fla. 3d DCA 2006), *rev. denied,* 949 So.2d 197 (Fla. 2007), and 5 *Florida Torts* § 150.24 (2007) (explaining that an agent may be liable

13

to a customer, through breach of contract or negligence, for the failure to perform an agreement to procure insurance coverage).

Although some fiduciary and general common law duties of care overlap, *Toomey* at 990 ("insurance brokers will often have both a fiduciary duty to their insured-principals *and* a common law duty to properly procure requested insurance coverage"), negligence and breach of fiduciary duty claims are distinct and separate causes of action, and are not necessarily co-extensive. *Toomey* at 990 (existence of fiduciary duty does not prevent jury from considering both a breach of fiduciary duty claim and a negligence claim).

In this diversity case, the court is obligated to apply Florida law. A careful reading of *Tiara II*, shows that the Florida Supreme Court expressed no intention to recede from established Florida law governing fiduciary and common law duties of care owed by insurance agents and brokers to their clients. Furthermore, when presented with what appears to be a novel question of Florida law, this court is obligated to decide the issue the way it appears the Florida Supreme Court would decide it. *See Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1290 (11th Cir. 2001). A lack of explicit Florida case law on an issue does not absolve a federal court of its duty to decide what the Florid Supreme Court would hold if presented with the issue. *See Freeman v. First Union Nat'l,* 329 F.3d 1231 (11th Cir. 2003). Accordingly, in this case the court must decide whether and under what circumstances the Florida Supreme Court would likely find that these established fiduciary and common law duties of care may give rise to an enhanced duty requiring a broker to advise the insured on appropriate levels of coverage, *i.e.* a duty to affirmatively make recommendations to the insured on the specific types and amounts of coverage reasonably and prudently needed to meet the insured's complete insurance needs.

### 1. General Rule: No Duty to Advise on Client's Insurance Needs

As a general proposition, an insurance agent has no duty to advise the insured as to the insured's insurance coverage needs. Gary Knapp, Annotation, *Liability of Insurer or Agent of Insurer for Failure to Advise Insured as to Coverage Needs*, 88 A. L. R. 4th 249, §3, 1991 WL 741640 (1991), citing, *inter alia, Fitzpatrick v. Hayes*, 57 Cal.App.4th 916, 67 Cal.Rptr.2d 445, (Cal.Ct.App. 1st Dist. 1997); *Murphy v. Kuhn*, 90 N.Y.2d 266 , 682 N.E.2d 972, (N.Y. 1997); *Nelson v. Davidson,* 155 Wis.2d 674 , 456 N.W.2d 343 (Wis. 1990); *Harts v. Farmers Ins. Exch.,* 461 Mich. 1, 597 N. W. 2d 47 (Mich. 1999). Furthermore, the general rule of no duty to advise clients about their insurance needs is equally applicable to insurance brokers. *Emerson Elec. Co. v. Marsh & McLennan Cos.,* 362 S.W.3d 7 (Mo. 2012)(neither insurance agent nor insurance brokers have a general duty to advise the insured on the insured 's insurance needs or on the availability of particular coverage); *San Diego Assemblers, Inc. v. Work Comp for Less Ins. Serv.,* Inc., 220 Cal.App 4th 1363, 163 Cal.Rptr. 3d 621, (Cal.Ct. App. 4th Dist. 2013); *XM Intern., Inc. v. China Ocean Shipping Co.*, 121 F.Supp.2d 301 (S.D.N.Y. 2000)(broker cannot be liable for failure to procure additional insurance coverage it was never asked to obtain and has no continuing duty to advise insured on insurance needs); *Tappan Wire & Cable, Inc. v. Cnty. of Rockland*, 305 A.D.2d 665, 761 N.Y.S.2d 237 (N.Y.App.Div. 2003)(broker had no continuing duty to advise, guide or direct client on obtaining additional coverage absent showing of special relationship).

### 2. "Special Relationship" Exception

Although the court has not been able to locate any Florida case directly on point, there is a well-developed body of case law throughout the country which establishes an exception to the general rule of no duty to advise. The exception becomes operative when an insurance broker

encourages and engages in a "special relationship" with its client, thereby triggering an enhanced duty of care to advise the client about the amount of coverage prudently needed to meet its complete insurance needs. *See generally Peter v. Schumacher Enter., Inc.,* 22 P.3d 481 (Alaska 2001) and *Fitzpatrick v. Hayes,* 57 Cal.App.4th 916, 67 Cal.Rptr.2d 445 (Cal.Ct.App. 1st Dist. 1997).

Case examples supporting a finding of a "special relationship" include (1) where the agent misrepresented the nature of the coverage being offered or provided, and the insured justifiably relied on that representation in selecting the policy; *see e.g. Fitzpatrick, supra* at 452; (2) where the agent voluntarily assumed the responsibility for selecting the appropriate insurance policy for the insured (by express agreement or promise to the insured), *see e.g. Harts v Farmers Ins. Exchange,* 461 Mich. 1, 597 N.W.2d 47, 51-52 (1999); (3) where the agent held itself out as having expertise in a given field of insurance being sought by insured, and the insured relied on that expertise; *see e.g. Meridian Title Corp. v Gainer,* 946 N. E. 2d 634, (Ind.Ct. App. 2011); *Warehouse Foods, Inc. v. Corporate Risk Mgmt. Serv.,* 530 So.2d 422 (Fla. 1st DCA 1988) ; (4) where the agent or broker exercised broad discretion to service the insured's needs, and received compensation above the customary premium paid for the expert advice provided, *see e.g ., Sintros v. Hamon,* 148 N.H. 478, 810 A.2d 553 (N.H. 2002); *Meridian Title Corp. v Gainer, supra,* and (5) where the agent was intimately involved in the insured's business affairs, or regularly gave the insured advice or assistance in maintaining proper coverage. *Buelow v Madlock,* 90 Ark. App 466, 206 S.W.3d 890 (Ark.Ct. App. 2005). These and other cases suggest that a trier of fact may engage in a multiple factor analysis to determine whether a broker shared a "special relationship" with its client. Considerations may include (1) representations by the broker about its expertise; (2) representations by the broker about the breadth of the coverage obtained; (3) the length and depth of the relationship;

(4) the extent of the broker's involvement in the client's decision making about its insurance needs;

(5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services.

### 3. "Special Relationship" - A Factual Determination for the Jury

Whether an insurance broker shared a "special relationship" with its client is a question of fact for the jury. Where the record contains disputed facts, the resolution of which could provide competent substantial evidence to support a finding of a "special relationship" between a broker and its client, summary judgment is improper; the matter must be resolved by a jury. *See e.g. Hill, Peterson, Carper, Bee & Deitzler, P.L.L.C. v. XL Specialty Insurance Co.,* 261 F. Supp.2d 546 (S.D.W.Va. 2013)(summary judgment precluded by fact issue on question of whether special relationship existed between agent and insured); *South Bay Cardiovascular Assoc., P.C. v SCS Agency, Inc.,* 105 A.D.3d 939, 963 N.Y.S.2d 688 (N.Y.App.Div. 2013)(genuine issue of material fact existed regarding whether insurance agency had special relationship with insured, precluding summary judgment on insured's claims for negligence and breach of fiduciary duty); *Buelow v Madlock,* 90 Ark. App. 466, 206 S.W. 3d 890 (Ark.Ct.App. 2005) (noting question of fact on whether special relationship existed between insurance agent and insured so as to trigger an enhanced duty of care).

### D. Application of Law to the Record

With these principles in mind, the court now examines whether the evidence in this case is reasonably susceptible of supporting a finding of fact that Marsh shared a "special relationship" with Tiara, thereby triggering a heightened duty of care on the part of Marsh to advise Tiara on the amount of coverage prudently needed to meet its complete insurance needs. If the finder of fact

were to conclude that such a "special relationship" existed, Marsh is then properly charged with an enhanced duty of care to advise Tiara on its coverage needs, either as a heightened fiduciary duty owed to the insured, a general common law duty of reasonable care, or both.

Tiara has presented evidence of a long-term relationship with Marsh; that it relied on Marsh to keep it appraised of its property insurance needs as well as its compliance with the terms of its insurance policies; that Marsh, through executive Neil Hewitt, regularly participated in Tiara insurance committee meetings to offer counsel and advice on Tiara's insurance requirements and needs; that Marsh generally holds itself out as an expert in the field of property casualty insurance; that Marsh specifically held itself out to Tiara in this case as its "exclusive insurance, risk management and risk financing advisor and insurance broker," responsible for performing advisory services under multiple insurance lines (including commercial property and general liability; commercial umbrella, crime, boiler and machinery, directors and officers liability, glass and windstorm insurance) and that Tiara in fact dealt exclusively with Marsh on all matters related to its insurance coverage needs, including its property insurance coverages. These facts, if credited by the fact finder, could support findings that Marsh held itself out to Tiara as a highly skilled expert in the property casualty insurance field, coupled with reliance by Tiara; that Marsh voluntarily participated in the calculation of Tiara's insurance needs; and that Marsh retained broad discretion in servicing the needs of Tiara and received extra compensation from it for performing those advisory "risk management" services.

The court also finds adequate evidence to preclude summary judgment on the question of whether Marsh breached any enhanced duty of care to properly advise Tiara on the sufficiency of its insurance coverage. There is evidence that Hewitt believed Tiara's reliance on the 2002 Allied

appraisal would cause Tiara to be under-insured at the time of the 2004-05 policy renewal, but did not share this opinion with Tiara; that Marsh ordinarily recommends procurance of an updated appraisal on an annual basis to all of its clients, but that Marsh did not do so in this case; that Hewitt failed to point out the existence of Citizen's particular co-insurance requirement (requiring coverage to be placed at 100 percent of the replacement cost) and failed to warn of the dangers of proceeding in breach of that co-insurance requirement.

While there is also evidence that Tiara's insurance committee members were aware, from direct dealings with Allied, that an updated apprisal in 2004 would likely show an increase of seven to nine percent in property value, and therefore were at least on notice of facts highlighting the under-insurance problem, the court does not find this sufficient to defeat the existence of a special relationship between the parties as a matter of law. Thus, while Marsh argues that Tiara made an informed, voluntary decision to knowingly reduce the true insurable value of the building in order to save money on policy premiums – a goal Tiara in fact achieved – this fact, even if true, would not operate to relieve Marsh, as a matter of law, from any obligation it may have assumed to properly advise Tiara on the sufficiency of its insurance coverages and to warn of the risks attendant to its under insured posture.

The fact that Tiara insurance committee members had access to the same information, or could read the same policy language as Marsh does not relieve Marsh from its obligation to provide a recommendation on what was the most prudent approach to protect Tiara's insurance needs, and to warn of the financial consequences of diverting from that approach. If it appeared to Marsh that the effective premium savings achieved by depressing the insurable value of the building was not economically justified by the corresponding financial risk attendant to the reduction in the loss limit

– particularly in light of Citizen's harsh co-insurance requirements – the burden was on Marsh, as the insurance expert in this equation, to share its professional judgment with Tiara and allow Tiara to make an informed judgment on the basis of that advice.

As the record stands, there is no indication that Marsh gave any professional advice or warning regarding the wisdom or folly of relying on the 2002 Allied appraisal as a starting point for fixing the insurable value of the condominium building, but rather that it simply "took orders" from Quinlan and/or the Tiara insurance committee, answering the committee members discrete questions about permissible factors for consideration in the calculation of insurable value, but without warning about the danger of such an approach or offering advice on best judgment alternatives.

## V. CONCLUSION

Having carefully reviewed the evidentiary record developed for summary judgment and with due regard for the written and oral submissions from counsel, the court finds there are genuine issues of material fact as to whether a "special relationship" existed between Marsh and Tiara so as to justify the imposition of enhanced common-law duties of care – more specifically, a duty to provide reasonable and prudent recommendations on the optimal amount of coverage needed to best protect the interests of the insured.

Furthermore, should the trier of fact find that such a "special relationship" did exist, thereby imposing the duty to advise, the record also reveals genuine issues of material fact on the question of whether Marsh breached that duty of care by failing to properly advise Tiara as to a reasonable and prudent amount of coverage to meet its complete needs, taking into account the co-insurance clause imposed under the Citizens' policy at issue; by failing to alert Tiara that the selected insurable value of the property, on which the policy loss limit hinged, left Tiara significantly under-

insured, and by failing to warn Tiara of the specific financial risks attendant to its under-insured posture.

Finally, the court finds there are genuine issues of material fact on the issue of causation, *i.e.* whether Tiara would have chosen a different course of conduct, *viz.* an updated property appraisal and selection of higher loss limits, had it known that it would be required to restore the building according to current code in the event of a loss; had it known that Citizens' policy imposed a co-insurance requirement mandating that it maintain coverage commensurate with cost of replacing the building; and had it known that reliance on an outdated appraisal, while legally permissible, could expose it to an "under insurance" coverage defense in the event of a loss and attendant coverage litigation. In other words, there is a genuine issue of material fact for a jury as to whether Tiara would have sought to modify the terms and conditions of its windstorm coverage in 2004-05 had Marsh satisfied its fiduciary and/or general duty of reasonable care to give proper coverage advice and make appropriate disclosures to Tiara under the circumstances of this case.

Therefore, because the record is susceptible to competing, reasonable inferences on the questions of duty, breach and causation, it is

**ORDERED and ADJUDGED** that Defendant Marsh, USA, Inc's renewed motion for summary judgment [ECF No. 286] is **denied.**

**DONE and SIGNED** in Chambers at West Palm Beach, Florida, this 13th day of January, 2014.

Daniel T. K. Hurley
United States District Judge

Copies provided to counsel.